Good morning, Your Honor. Steve Hubachek, Federal Defenders, on behalf of Mr. Martinez-Valdez. Your Honors, in Navarro-Vargas, this Court said the Grand Jury has no obligation to prepare a presentment or to return an indictment drafted by the prosecutor. That's in the en banc opinion at page 1200. The District Court here told these Grand Juries the exact opposite, even using the same word this Court used in obligation. When at page 262 of the excerpt of record, he said, after the probable cause test, and then your obligation, if you find those to be true, would be to vote in favor of the case going forward. Let me ask you something. The District Court did give the, let's say the standard, you don't have to agree with me, the proper, but the standard instructions. What you say about obligation has a lot of force, I think. Here's the only concern, at least that I have at this moment, or a concern. When the obligation language came up, it comes up in colloquies with a couple of jurors, each of whom is essentially saying, you know what, I don't, for example, I don't like drug, and I don't care if there's probable cause in a drug case or not, I'm going to vote against it. Now, that's a little bit off the wall. It's kind of like a death case. You know, if a juror gets up and says, I'm not going to vote for death no matter what, you kick them off the jury. If the person gets up and says, we have a lot of trouble with death cases, and yeah, there are cases I might give it and cases I wouldn't, that's different. These people seem to be saying, I don't care what you present to me. If it's a drug case, I'm not going to indict. If it's an immigration case, I'm not going to indict. So he uses the obligation language in that sort of context. Does that make a difference? I don't think it does, but if I want to make sure that we're all talking from the same premises, the first part of your question, Your Honor, you talked about how Judge Burns actually gave the standard instruction, and you're absolutely right that he gave portions of it interspersed with other additional comments. So when I agree with you that he did use some of the language that's found in the Faro-Vargas, I'm not agreeing that it's the same instruction at any point during this, because he adds different things in. I'm worried about this part that we're focusing on. But getting to the real meat of the question is I dispute the premise that we're talking about absolutist-type jurors here, and there are two of them. One I denoted as LSW, and the second one as REA, the real estate agent. I'd like to talk about the second one. The second one, I don't even know if it's used. Which page is it? Do you remember which page? 261. Yeah, there's the exchange with REA, I think, starts around 259 and goes to about 263. He says, I think rapists and murderers have to go to jail, not people using drugs? That's correct. That's the one? Okay. And he does, I mean, Judge Fernandez's question is absolutely correct. He does express some concerns about the drugs and drug laws and so on and so forth. Although I point out that at no time were those concerns narrowed in terms of a lot of people have concerns about drug use being prosecuted. I mean, California, in a proposition, created those drug courts for people involved in drug use. Yeah, but he says we live in the state of California, not federal California. Right. And if California likes it, then I'm not going to vote for it. That's sort of what he said. He did say in the context of medical marijuana, which, again, is a very unusual case in our district. But those concerns were never clarified. But I think if you get to the end of the colloquy between Judge Burns and REA at pages 262 to 263, he basically completely disavowed any sort of per se rule. You know, is it possible, he said, you know, depending upon the case, I might. And then he gets excused after that. So it's definitely a case-by-case basis. Maybe he's the kind of person who would only vote no on drug use cases, which he would never see anyway. And which nobody. On what kind? I said maybe he would vote no on an indictment only in drug use cases. We don't know. Drug use cases. Okay. Or maybe just on medical marijuana cases. Again, we don't know. And Judge Burns said it was okay to refuse yourself in medical marijuana cases if you wanted. But the bottom line is, is that the obligation instruction, I think, did not come up in the context of a person who was saying per se rule, I will not vote for any drug cases. It's nice you started with him. Yes. Yes. So let's go back to the first one, which is a little tougher. The first one, I think, you know, is that is a bigger problem for me. Because he doesn't, there's less to say to the extent of that person's bias against drug-type cases. But, again, even in that context, there was no clarification to indicate that he was talking about only drug use cases as opposed to drug trafficking cases, which is what we see in our district, is drug trafficking cases. The grand jury in the Southern District of California is not indicting personal use drug cases. It just simply doesn't happen. And that was never really clarified. So I don't think even that individual said that, you know, the type of case that you typically see, I would never vote to indict. But the REA juror certainly made it more clear. And the thing is, is that Judge Burns, when he made these comments, you know, using the word should twice in a row and then later on with the obligation, he never made any sort of effort to tell the jurors, you know, what he was talking about, assuming that he was harboring, you know, some sort of view about people who have per se rules, who would never vote to indict a particular type of case. If that's what he was trying to address, he never made that clear to the jurors. And he never said, you know, this is a specific instance where someone is saying they won't indict on any case that we present having to do with drugs. And I don't think that's an accurate characterization. At this point, has the grand jury been sworn? I think the grand jury gets sworn at the beginning of the second part of the instructions. I'm pretty sure that that's what happened. But I'll tell you. So they've just taken a note to answer his questions correctly. Right. Right. And, again, you know, Judge Burns made those various comments and didn't provide any sort of limitation to them at all. And he also did it in the context of consideration of penalty information. He basically equated the grand jurors with pettit jurors and told them twice, once during the voir dire at pages 259 to 60. That's, again, in the exchange with REA. And also, again, at page 211, that they're basically similarly situated with pettit jurors and that they cannot consider any sort of penalty information. Do you think grand jurors can consider that? Yes. Yeah, cannot. Do I think that they can? Yes, I do, Your Honor. And I do based upon the language in Vasquez v. Hillary, which this court adopted in the en banc decision in Navarro-Vargas, where it said that the grand jury gets to decide between, you know, more serious and less serious cases, one count or multiple counts, even capital versus non-capital counts. That type of analysis would necessarily involve being able to consider penalty information. And, in fact, the basis of this court's decision in Cortez-Rivera was that the instruction in that case was okay because it left what it described as a narrow window of discretion on the part of the grand jurors to exercise discretion as to penalty. Your clock is ticking down. Did you wish to address any of the other issues that you raised? Well, Your Honor, if you don't have further questions as to the grand jury issue, I'd like to reserve the rest of my time for rebuttal. Unless, Your Honor, you want to hear about the other issue, Mr. Murphy is ready and available to address it if you have questions. Well, you raised them. Thank you, Your Honor. Gregory Murphy, Federal Defender of San Diego, on behalf of Mr. Martinez-Valdez also. Can I just ask a couple on the firearms count? Of course, Your Honor. Grand jury indicted on firearm and felony, right? That's right, Your Honor. I think that's right, Your Honor. I don't mean to quibble. He pled guilty to the statute, and as part of his plea, colloquially admitted that he had been convicted of a felony. Our position, of course, is that because the felony is not an element of the crime, it is a misdemeanor element.  it is a misdemeanor element. Your cases are not exactly on point. Don't you lose on that? If, Your Honor, if a felony is an element of the crime of carrying a loaded weapon, then certainly under a second-stage analysis, his admissions are problematic. And in that regard, I think it's important to note that the most recent 28J submission by the government, which is the CalJIC instructions, the government has said we submitted the official instructions, the California instructions at the time of trial, and I believe it's part of the CalCrim. The CalCrim, exactly. Which defined the three elements. That's right. And do not include the felony. In fact, that's in a separate instruction for enhancement. They say it's an enhancement. I don't know if CalCrim is any more. What did you call it? It's official, Your Honor. It's published by the Judicial Council, I believe. It is official, but then I don't know that it's any more official in terms of binding courts than Dan is CalJIC. Your Honor, my understanding is that it's published by a committee of the Judicial Council. I believe that's the CalJIC instructions. Even the CalJIC instructions. CalJIC is a superior court of Los Angeles County, I believe. Even the CalJIC instructions on this particular quote, unquote, element, it's in brackets, which signals that it only applies in certain circumstances. That's right, Your Honor. And that's when they need the enhancement to elevate the crime to a felony. And that follows. And we know now under Apprendi and all the other cases that they're going to jack up the sentence with a critical fact that either needs to be admitted or submitted to the jury or what. Right. It would have to be. Right. In this case, they could not have done it in this way without his, I suppose, stipulation at some point. But he. Or a jury would have to find the fact is true. Or have you. But that was not, but it was not an element of the official offense. That is correct. So the jury could conclude that he was guilty of the offense. That's correct. But not guilty of the sentence. Of the enhancement. Of the enhancement. And whether you call it an enhancement or not, the California courts tend to bifurcate those questions anyway, I believe. Your Honor, I think it's bifurcated in the statute, in fact. It says a person is guilty of this offense and then the. I don't mean that. I mean, whether you say it's an enhancement or not, as a practical matter, I think California trial courts tend to bifurcate the trial on the felony from the trial on the offense, the other part of the offense. I'm afraid I'm not qualified to. They do. They tend to do that. They tend to do that. Go ahead. That's all right. Because a defendant generally doesn't like the jurors to know that he's a prior felon, so they usually split that issue. They sever it and they do a separate trial. And then the defense usually. Admits. I'm sorry. The essential point is that the offense of conviction is, does not have this element. And because it does not have this element, no second-stage analysis is undertaken. And so any statements that are made by Mr. Martino-Valdez after he's pled guilty to the offense are not, before this Court, are not second-stage analysis. You had one other issue, which would also result, if you prevailed on it, would also result in a dismissal of the indictment. Is that correct? That's right, Your Honor. I notice I have two minutes remaining. I do want to make sure Mr. Kovachek has a moment. Would you, the Court, like me to address that? That's okay. You can save your time. Thank you. Good morning. Kyle Hoffman from the United States. If I could start with the grand jury issue. Judge Fernandez, I think, and Mr. Kovachek, got us off on the right track, which is there really isn't any question that the instructions that were given, instructions I'll call them, instructions per se, were the ones that were approved in Vargas. So the formal instructions. Correct. Right. What we're talking about, except for two things. One is there is a colloquy in the voir dire of individual grand jurors. And then there's a short elaboration about punishment in the actual formal instructions. Now, Mr. Kovachek, I believe, said that at that point on page 211, Judge Fernandez said you cannot consider punishment. I would beg to differ. He said you should not consider punishment in accordance with the standard instructions. We tell pettit jurors that they are not to, so the word cannot does not appear there. So there is a slight elaboration or deviation from the approved formal instructions, but not to the extent that Mr. Kovachek has said. You counted the instructions up front. Correct. So that's not, and that, to pick up on Judge Piazza's point, they haven't even been sworn to follow the instructions as grand jurors yet at that point. I believe that's the case. I haven't checked that. That's my understanding. I just. Now. Court, he does say then, he does say if you disagree with Congress's judgment about this being a crime, then your option is not to, your option is not to say, well, I'm going to vote against the indictment even though I think the evidence is sufficient, or I'm going to vote in favor, et cetera, et cetera. Instead, your obligation is to contact your congressman. He pretty clearly says that you don't have an option of saying I'm going to vote against it. Your Honor, I'm not sure what page reference you're referring to. I'm referencing pages 8 to 9 in the transcript. And I'm sort of quoting. And if you disagree with that judgment made by Congress, then your option is not to say, well, I'm going to vote against the indictment even though I think the evidence is sufficient, or, and then he takes the other side of it. Instead, your obligation is to contact your congressman. Yes, Your Honor. Judge Piazza, I think, again, I'm not quite sure where that appears in terms of the timeline of the grand jurors, voir dire, preliminary, and so on. It's a preliminary comment. What I would suggest is that's actually been a, that concept has been approved in Vargas. The formal instructions say you cannot consider the wisdom of congressional statutes. Yes. So I would suggest that's no different in that preliminary context than that concept. And I would also suggest, I think this, I think Judge Piazza and I think you both raised this issue. If you really think about what the district court was doing, and he understood himself to be doing when he was having these colloquies in voir dire, was he had grand jurors who said, I don't believe drugs should be illegal. I mean, I think that's a direct quote. No drugs should be considered illegal. That's a 251, 252. I also feel that drugs should be legal. That's a 260. So there's licensed social worker and real estate agent. And what the district court judge considered was happening there was I've got people who are not going to abide by that instruction. That is, you can't basically put yourself in the seat of Congress. And the reason you can tell that is if you look at the district court when he does, this is the other time he elaborates on the formal instructions, he says, it's not for you to judge the wisdom of the criminal laws enacted by statute. And then this crucial point I point you to, this is at 210 and 211. A couple of people expressed, I think, that they weren't going to do that, and they were excused. That was his understanding of what had gone on. And that's what he was telling the grand jurors had gone on, and that's what you can't do. And that's been approved. The difficulty is there are these formal instructions, and if you look at Navarro Vargas and sort of struggle with the opinions, the formal instructions kind of push the limits of what you can tell a grand jury, because judges always have the view, we don't want any of this jury nullification stuff going on. And so try to tell that to the grand jury, even though they have more discretion than a pettit jury. And then the judge just can't help annotating those comments. And his problem is when he starts drifting off into his annotations, he leaves us with this kind of appeal. I don't disagree that there's a little, well, if the district court judge has stayed strictly according to script, but that just can't, that just doesn't happen. I think all of us have been in trial courts, grant in front of grand juries, it just does not and cannot happen. And what I'm suggesting is that where there is deviation from the script, first of all, it's not in the formal instructions. Second of all, it's understood in a certain context, and it doesn't constitute, in effect, a deviation that makes a difference. So just as I understand it, all the grand jurors are sort of in this room where this question is taking place, is that correct? Correct. And they're all listening to this. Correct. Is that right? I think that's right. I haven't personally been there when, I've been in the grand jury room, but I haven't personally been there when they've been instructed. But I think they're all there. I don't understand when you say it's not in the formal instructions. Page 2 of the transcript we have, he starts out saying, ladies and gentlemen, you've been selected to sit on the grand jury. Stand and raise your hands. Swear you'll diligently inquire into the presentment of all the indictments, et cetera, et cetera, et cetera. And the answer, I do. That's at 9.30 a.m. That's what happens. And this other stuff, the voir dire kind of stuff, starts taking place at 9.45 a.m. So it looks to me like they're sworn. So I don't understand when you say, well, this is just, this isn't, I can understand you saying that the language, the deviator phone isn't all that important. But to say it is not in the grand jury room. On page 2, doesn't he start out by the clerk of the court, I guess it's Mr. Hamrick, you and each of you do solemnly swear to affirm, or affirm that you will give truthful, true answers to all questions that will be put to you, touching on your qualification to serve as a grand jury during this session of court. So help you. Okay. And keep secret, not present an indicting person through hatred, and blah, blah, blah, blah, blah. Anyway. In a way, I don't know that this matters. I was picking up on a suggestion that Justice Breyer submitted, and I confess it was not one that I had boned up on, so to speak, prior to the argument. But the general point, which I'm trying to get across, is that the deviations, such as they were, were either in the context of these individual voir dires, they weren't enough to essentially amend the grand jury instructions in a way that causes a problem that needs reversal. And the formal instructions, though there were a couple of faints here and there, they certainly didn't deviate in that way. And then when you really understand the context, he was telling the grand jurors, you cannot basically become Congress here. And that's how he understood it, and that's how he told the grand jurors. So I only have a few more minutes. I'd like to touch on the other questions after getting double-teamed by my worthy colleagues. I'm sure you're familiar with these gentlemen. Oh, yes. Mr. Helichek and I were having a reminiscence session beforehand. We've known each other a long time. The gun. I would suggest that the argument about is it an element, is it a sense enhancement, it reminds me of the old middle-light commercials where people yelled, taste great, less filling. And in a way, it's an unilluminating kind of discussion. It's an unilluminating exchange of labels of what matters here. Well, it's an important point. It is an important point. It means a lot in terms of jail time and prison time. You're correct. But the point is about the function and what happens. And this was, I think, the effect of the colloquy that you had with Mr. Murphy, which is this. And Judge Hogan, I think, raised this as well. What happened here was this defendant, his gun crime occurred in 2003, or at least he got charged in 2003 and he pled guilty in 2004. We're four years beyond apprendi. At that point, to get a felony, to get the kind of time he had to get, he had to stand up in front of a judge or the state had to prove to a jury that he had a prior felony conviction. It didn't do anymore for a judge to find it. That's because of apprendi. So he did that here. He stood up and said, yeah, I had a prior felony conviction when I carried this loaded firearm. And so to that extent, whether you call it a sentence enhancement, whether you call it an element, in a sense it doesn't matter. It's an element for the purposes of judging whether it's an aggravated felony. But there is a certain methodology that we follow. Correct. And I'm suggesting that here under the, quote, unquote, modified categorical. But the problem is, is we don't get under our current case law, we don't get to the modified categorical analysis if there's an essential element that's missing from the argument. Here's my suggestion, Your Honor. It's this. There's a recent Supreme Court case that kind of, I'm trying, I colloquially characterized it with the Miller Wright example. I think it's called Satien or Satican, which essentially says it doesn't matter. These are labels. What matters is. I understand that point. But what matters in terms of the label for the purposes of aggravated felony is, did it have to be admitted to a judge or proved to a jury? That makes it an element for the purposes. What's the name of that case? Do you believe it stands for that proposition? It's Satican or I can, I'll provide it to the court. I'm sure we can find it. I can direct you to exactly the case. That's what I'm getting at. Now. Now, you're familiar with our law in this whole area. Navarro? Navarro, Lopez? Yes. And the cases that I think that are. Kawashima. Right. The cases that I think the defendants really rely on, the appellants really rely on, what's different there is the Kawashima, the defendants didn't have to stand up in front of a judge and say the loss amount was such and so to be convicted of a felony, say, or to get a sentencing enhancement. That increased the statutory maximum. That's the same thing with the, I'm sorry, I'm blanking on the name, the other. Navarro, Lopez. Yeah, the praise, the moral turpitude. They didn't have to stand up in front of a judge or have it be proved to a jury, certain facts that then increased the statutory maximum. Here, he did. That's what I'm suggesting the real difference was. Okay. Now, as far as the voluntary, the collateral attack on the deportation, here's what I have to say about that. If you actually look at the district court's order, what essentially he said was, I think this defendant was advised that he had the right for voluntary departure. I think he effectively waived that right. And I think... How could he? How did he waive it? Well... He said, do you have the money? Right. That's exactly what the judge said. Do you have the money? But if you look at... Show me the money. And if you look at actually what followed that, I agree. He said, but what he said beforehand was, you have a right to voluntary return, voluntary departure. Here's what's going to happen. If the government opposes, you're going to be here two more weeks. If the government doesn't oppose, you can go back. I'm going to ask you if you have the money, et cetera. And he also advised very clearly about what the consequences were. He has to have the money, right? Eventually, yes. He has to have the money. That's clear, too, by the statute. He has to pay his way back. Now, why I think Judge Lorenz said he's effectively waived it, when it came up individually, it's true. The immigration judge said, do you have the money? No. And then he went on to a lot of other things. Do you want to talk to your parents about visas? Do you want to talk to other things? And the appellant, the defendant, at that point, he basically said, I don't want to do any of this. I just want to get out of here. And I think that's why Judge Lorenz said he's effectively waived it. He effectively didn't want to pursue voluntary departure. And if you think about it... He could have easily said, you know, I'm out of here. I'll take voluntary departure. I won't suffer the 10-year bar, whatever it is, and I'm gone. And most likely, you know, the immigration judges have all these very heavy calendars. It's discretionary, but at that point I recognize it. But the records, what we see is that they tend to grant pre-conclusion right at the outset. If they're willing to take voluntary departure, out they go. Right. I understand. But what I'm trying to suggest is that that was the basis of Judge Lorenz's ruling. He effectively waived it. He didn't pursue it. He didn't say, I can go get the $7 real quickly, which is, as I understand it, this defendant speaks English. He was here a long time. It's not that complicated. It's not like other areas of immigration law. But I want to step back and make another broad point, which is kind of a two birds with one stone argument. And that's this. If you find that the aggravated felony sentencing enhancement applies, this defendant could never have gotten voluntary departure because that means it's an aggravated felony and that terrorism crimes and aggravated felonies are the two that are, you just can't get voluntary departure. So I'm suggesting that if you find the sentencing enhancement, this other matter just goes away. Thank you very much. Thank you. Your Honor, I think the exchange between Mr. Hoffman and Judge Fernandez about pages 210 and 211 of the ER is definitely in the formal instruction. And while it is true that the Bar of Argos allows the district court to tell the grand jurors that they can't, you know, consider the wisdom of the laws passed by Congress, it does not permit him to go on, which he did just a couple of moments later, and tell them that there are circumstances under which they cannot exercise their discretion as grand jurors not to indict. That's a clear violation. That same portion also incorporates by reference the obligation comments because it refers to the interactions between Judge Burns and the two grand jurors. So it effectively incorporates into the more formal portion of the instructions all of his comments. Now, there was a question about whether or not everyone is present listening to these, and that's definitely true. On page 272, Judge Burns addresses one of the proposed grand jurors and says, You've been sitting here all morning. You've heard the questions and answers that I've provided. There's no question that the voir dire exchanges are intended to convey substantive information to the grand jurors. At page 237, Judge Burns tells them, I'm going to tell you about the grand jury today. I'm going to talk to you a little bit later in my remarks and, quote, and in my interactions with you today. So he's telling them that he's providing them substantive information in the course of his remarks during the voir dire portion. And there's also no question that the general subtext of all of his remarks are to discourage any sort of grand jury discretion that any grand juror might exercise. He tells them at page 296, we enforce the federal laws here. This is not a judge that's trying to retain the discretion that Navarro Vargas says that they have. So I think that taken as a whole, the voir dire remarks and the formal remarks, which Judge Burns, by the way, describes as, quote, a further charge, meaning that they've already had a charge. And he calls it the further charge at page 204. And finally, as to REA, REA says, quote, there's a chance. That's at page 262 to 263. At page 262, it says it would depend on the case. So Judge Burns told these grand jurors, by excusing him, that if you might exercise your discretion, you are unfit as a grand juror. Okay. Thank you, Mr. Rubinstein. We appreciate the arguments on both sides. And the matter will be submitted at this time.
judges: Fernandez, Paez, Hogan